**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHRISTIAN GERARD GIBSON,**

        **Plaintiff,**

                                **Civil Action 2:19-cv-5001**

     **v.**                            **Judge James L. Graham**

                                **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Christian Gerard Gibson ("Plaintiff"), brings this action under 42 U.S.C. §

405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner")

denying his application for disability insurance benefits and/or supplemental income insurance.

This matter is before the United States Magistrate Judge for a Report and Recommendation on

Plaintiff's Statement of Errors (ECF No. 7), the Commissioner's Memorandum in Opposition

(ECF No. 11), Plaintiff's Reply to the Opposition (ECF No. 12), and the administrative record

(ECF No. 6).  For the following reasons, it is **RECOMMENDED** that the Court **REVERSE** the

Commissioner's non-disability finding and **REMAND** this case to the Commissioner and the

ALJ for further consideration consistent with this Report and Recommendation.

### I.  BACKGROUND

Plaintiff applied for a period of disability and Social Security disability insurance benefits

on March 8, 2016, alleging disability beginning February 21, 2016.  (R. at 151-152.)  Plaintiff's

claim was denied initially and upon reconsideration.  (R. at 75-78.)  Upon request, a hearing was

held on June 29, 2018, in which Plaintiff, represented by counsel, appeared and testified.  (R. at

29-49.)  At the hearing, Plaintiff amended his application and requested a closed period of disability from February 21, 2016 to April 1, 2017.  (*Id.*)  A vocational expert ("VE"), Eric Pruitt, also appeared and testified at the hearing.  (*Id*.)  On October 25, 2018, Administrative Law Judge Timothy Gates ("the ALJ") issued a decision finding that Plaintiff was not disabled.  (R. at 15–24.)  On September 14, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–6.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

## II.  RELEVANT HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the June 2018 administrative hearing that he was a letter carrier for the United States Postal Service from March 1997 until February 2016.  (R. at 34-35.)  As part of this work, Plaintiff was walking from house to house throughout most of his shift, and lifted up to fifty pounds in weight.  (R. at 35-36.)

Plaintiff explained that he was in the hospital from February 21, 2016 through March 18, 2016.  (R. at 36.)  Plaintiff testified he originally went to the hospital to get his left pinkie toe amputated, but the doctors found that the gangrene and the infection in his pinkie toe had spread, "[s]o then [his] second from the pinkie toe got amputated" as well.  (*Id.*)  Plaintiff testified that the gangrene and infection then spread again, resulting in three more toes being amputated, and that he also had a procedure to address blood circulation from his upper body to his foot.  (*Id.*)  All in all, Plaintiff testified he had four procedures while in the hospital, including three surgeries.  (*Id.*)

Plaintiff stated that upon discharge from the hospital, he continued to be treated by his podiatrist, Dr. Davy, and by Ohio Health Home Care.  (R. at 36-37.)  Ohio Health Home Care

came to Plaintiff's house to change the dressings on his foot, and treated Plaintiff until October 2016. (R. at 37.) Plaintiff testified that in December 2016, he told Dr. Davy he wanted to go back to work, but Dr. Davy was not comfortable with Plaintiff returning to work until he was completely healed. (*Id.*) Plaintiff testified that his desire to return to work in December 2016 "was just [his] frustration with not working" because he "was so used to working and [he] just wanted to get back," but "[his] foot still had to heal." (R. at 37-38.) Plaintiff testified that he didn't believe that he could have worked in a job where he was sitting most of the workday, as of December 2016. (R. at 37.)

Plaintiff testified that he returned to Dr. Davy in March 2017, and that he told Dr. Davy that he was "waiting for a decision from the postmaster" regarding his return to work. (R. at 38.) Plaintiff testified that, as of March 2017, the Postmaster "was expecting [Plaintiff] to come back and walk, and [Plaintiff] could not come back and walk," so the Postmaster "did not have a position for [Plaintiff] yet." (R. at 39.) Plaintiff stated that he needed to be on light duty, because he couldn't walk and carry mail anymore. (*Id.*)

Plaintiff confirmed at the hearing that he returned to work in April 2017. (R. at 39.) Plaintiff stated that since returning to work, he stands or walks "intermittently" for less than 15-20% of his work shifts. (*Id.*) Plaintiff testified that he drives a mail truck with an automatic transmission, but he doesn't use his left foot at all while driving because he has always driven with his right foot. (R. at 39-40.) Plaintiff also confirmed that he did not have any mental health treatment related to his claim. (R. at 40.)

Plaintiff also testified that during his recovery process, he elevated his foot "every time" he sat down, and if he was sitting up he elevated his foot "close to chest level." (R. at 41.) Plaintiff testified that since returning to work, he continues to elevate his foot at home, but he

3

cannot elevate his foot in his mail vehicle.  (R. at 41-42.)  Plaintiff testified that he takes breaks during the workday to stretch and to increase circulation to compensate for not being able to elevate his foot, and then he elevates his foot when he gets home.  (R. at 42.)  Plaintiff also testified that he used a walker until late August or early September 2016, and that he used a cane for a week in September 2016.  (*Id.*)

## B.    Vocational Expert's Testimony

Eric Pruitt testified as the VE at the administrative hearing.  (R. at 43-47.)  Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could perform the following jobs that exist in significant numbers in the national economy:  film touch-up inspector, laminator, and printed circuit board touchup screener.  (R. at 44.)  Mr. Pruitt also testified that "anything over 10 percent of off task behavior would be work preclusive for unskilled work."  (R. at 47.)

## III.  RELEVANT RECORD EVIDENCE

## A.    Grant Medical Center

Plaintiff was hospitalized at Grant Medical Center from February 21, 2016 until March 18, 2016.  (R. at 273-815.)  On February 21, 2016, Plaintiff was admitted to Grant Medical Center with signs of gangrene on his left foot.  (R. at 287.)  He reported cutting his left great toe when he was putting on his shoe about a week prior, and said he had noticed increased redness, pain, and swelling.  (R. at 279.)  Plaintiff stated it was painful to walk.  (*Id.*)  An examination revealed a left fifth toe with black colored skin, breakdown of the skin at the tip, foul odor, as well as minimal sensation to the toe.  (R. at 282.)  Plaintiff underwent an emergency amputation of his left fifth toe, left open, on February 21, 2016.  (R. at 291-293.)

Plaintiff remained at the hospital following the procedure.  Plaintiff was not immediately improving, however, so on February 25, 2016, Plaintiff underwent a left foot incision and drainage procedure.  (R. at 330-332.)  On March 3, 2016, after Plaintiff developed worsening wounds and necrosis of the dorsal aspect of the foot, Plaintiff underwent another surgical procedure, including left foot open wound debridement, left foot fourth digit amputation, left foot fourth and fifth metatarsal head resections, and wound VAC application.  (R. at 417-419.)  On March 8, 2016, Plaintiff underwent another procedure, including an abdominal aortogram with bilateral lower extremity runoff, selective left renal arteriogram, selective left anterior tibial artery arteriogram, selective left posterior tibial arteriogram, and 2.5mm x 220 mm Ccyote balloon angioplasty, left posterior tibial artery.  (R. at 472-474.)

On March 9, 2016, Plaintiff's treating podiatrist Trevor A. Davy, D.P.M. explained to Plaintiff that the combination of Plaintiff's impaired blood supply and infection had caused severe destruction to Plaintiff's foot.  (R. at 480.)  Plaintiff was presented with the options of having a trans-metatarsal amputation or a below-knee amputation, and ultimately chose to have a trans-metatarsal amputation performed.  (R. at 480, 528.)  On March 17, 2016, Plaintiff underwent a left foot trans-metatarsal amputation.  (R. at 593-595.)

Plaintiff was discharged from Grant Medical Center on March 18, 2016.  (R. at 603-604.)

## B.    Ohio Health Home Care

Plaintiff was ordered to receive care from Ohio Health Home Care following his hospitalization.  Plaintiff testified that nurses primarily came to his home to change the dressings on his foot, and the records show that Plaintiff received such assistance through October 6, 2016. (*See generally* R. at 37, 1223-1386.)

C.     **Trevor A. Davy, D.P.M.**

Podiatrist Trevor A. Davy, D.P.M., was Plaintiff's treating physician both during and

after Plaintiff's hospitalization.  (*See generally* R. at 273-815.)  Upon Plaintiff's discharge,

Plaintiff continued to see Dr. Davy at Elite Foot & Ankle medical center.  Plaintiff's first

appointment with Dr. Davy at Elite Foot & Ankle was on March 24, 2016, approximately one

week post-discharge from Grant Medical Center.  (R. at 837-838.)  Dr. Davy's notes from that

appointment indicate Plaintiff "states that he has been non weightbearing as directed" and "states

that his pain is well controlled with pain medicine."  (R. at 837.)  On March 31, 2016, Plaintiff

returned to Dr. Davy.  (R. at 912-913.)  Dr. Davy noted that Plaintiff "states that he is doing

well," "states that he has been non weightbearing as instructed," and "states that his pain is

decreasing."  (R. at 912.)  After examination, Dr. Davy concluded that Plaintiff's "incision is

stable," and ordered Plaintiff to remain non weightbearing.  (R. at 913.)

On April 7, 2016, Plaintiff returned to Dr. Davy.  (R. at 910-911.)  Dr. Davy stated the

Plaintiff "states that he has been non weightbearing as directed."  (R. at 910.)  Dr. Davy left

Plaintiff's staples intact, and ordered Plaintiff to remain non weightbearing.  (R. at 911.)  Dr.

Davy concluded that "[t]he wound is stable and we will defer treatment until his incision has

healed completely."  (*Id.*)  On April 14, 2016, Plaintiff returned to Dr. Davy.  (R. at 908-909.)

Dr. Davy reported that Plaintiff "states that he is doing well," "states that he is not currently in

pain," and "states that he has been non weightbearing as instructed."  (R. at 908.)  Dr. Davy

removed Plaintiff's sutures, and instructed Plaintiff to remain non-weightbearing and to continue

to change the wound dressing daily.  (R. at 909.)  On April 28, 2016, Plaintiff returned to Dr.

Davy.  (R. at 906-907.)  Dr. Davy noted that Plaintiff "states that he has been non weightbearing

as directed."  (R. at 906.)  After examination, Dr. Davy told Plaintiff "that his incision may be

failing," and Plaintiff "stated that he wanted to try as long as he could to get his incision to heal."
(R. at 907.)

On May 19, 2016, Plaintiff returned to Dr. Davy. (R. at 904-905.) Dr. Davy noted that
Plaintiff "states that he has been non-weightbearing as directed" and that Plaintiff was interested
in trying hyperbaric treatment on his leg. (R. at 904.) Dr. Davy observed that "[t]here is
significant incision healing needed," and Dr. Davy recommended that Plaintiff try hyperbaric
treatment and "[r]emain non weightbearing." (R. at 904-905.) On June 9, 2016, Plaintiff
returned to Dr. Davy. (R. at 902-903.) Dr. Davy reported that Plaintiff "states that he is doing
well," "states that he has been non weightbearing as directed," and stated that he had received
one week of hyperbaric treatment. (R. at 902.) Dr. Davy wrote that Plaintiff "has made slow
progress" and "[w]e are trying to avoid a below knee amputation." (R. at 903.)

On July 12, 2016, Plaintiff returned to Dr. Davy. (R. at 900-901.) Dr. Davy wrote that
Plaintiff "states that he is doing well" and "states that he has been non weightbearing as
directed." (R. at 900.) Dr. Davy noted that Plaintiff had been getting hyperbaric treatment as
instructed and ordered Plaintiff to continue that treatment. (R. at 900-901.) Dr. Davy ordered
Plaintiff to return in approximately four weeks "for possible advancement to weightbearing."
(R. at 901.) On August 17, 2016, Plaintiff returned to Dr. Davy. (R. at 898-899.) Dr. Davy
reported that Plaintiff "states he is doing well," and "states that he has also been non
weightbearing as instructed." (R. at 898.) Dr. Davy provided Plaintiff with new wound care
instructions, and wrote that Plaintiff "will not likely return to work within the next year." (*Id.*)

On September 6, 2016, Dr. Davy wrote an open letter "To Whom It May Concern"
regarding Plaintiff's "inability to work for at least a year." (R. at 893.) In the letter, Dr. Davy
noted Plaintiff "is still currently healing [from] the surgery and is still unable to bear weight. He

7

is currently incapable of performing work of any type due to his risk of complication and limb loss." (*Id.*)

On September 7, 2016, Plaintiff returned to Dr. Davy. (R. at 896-897.) Dr. Davy noted Plaintiff "states that he has been compliant with his care instructions" and "states that he has been getting [hyperbaric treatment] and home health as directed." (R. at 896.) Dr. Davy stated that Plaintiff "may begin partial weightbearing," and ordered a follow-up appointment "for possible [prescription] for custom diabetic shoes with toe filler." (*Id.*) On October 5, 2016, Plaintiff returned to Dr. Davy. (R. at 894-895.) Dr. Davy noted Plaintiff "states that he is doing well" and "states that he has been walking around the house without any new skin breakdown." (R. at 894.) Dr. Davy prescribed custom shoes with a toe filler, and indicated that Plaintiff "may continue limited weightbearing only." (R. at 894-895.)

On November 2, 2016, Plaintiff returned to Dr. Davy. (R. at 938-939.) Dr. Davy reported that Plaintiff stated he had no open wounds, and that Plaintiff had been fitted for custom shoe inserts with a toe filler, but he was not able to afford diabetic shoes so he would have to wait to get them in a few months. (R. at 938.) Dr. Davy ordered that Plaintiff "may continue with limited weightbearing until he gets his custom inserts with toe filler," and concluded that Plaintiff "may return to work in the next few months in a sit down position." (R. at 939.)

On November 9, 2016, Dr. Davy wrote another open letter "To Whom It May Concern" regarding Plaintiff's condition. (R. at 929.) In the letter, Dr. Davy wrote Plaintiff "was at severe risk for limb loss," but "had follow up visits every 1-4 weeks since his [transmetatarsal] amputation." (*Id.*) Dr. Davy also noted Plaintiff's hyperbaric treatment. (*Id.*) Dr. Davy concluded Plaintiff's "incision is currently healed and he is awaiting custom prosthesis and shoes," and that Plaintiff "also has left lower leg atrophy and muscle weakness due to his

immobility." (*Id.*) Dr. Davy wrote that "[c]urrently [Plaintiff] is unable to work," adding that

Plaintiff's "prognosis is guarded" and "[h]e may be able to return to work in a sit down position

once he has the prosthesis, shoes, and regained his muscle strength." (*Id.*) Dr. Davy concluded

by adding that Plaintiff "will not able to return to work in any capacity for 12-18 months from

the onset of this condition." (*Id.*)

Dr. Davy also completed a "Lower Extremities Impairment Questionnaire" regarding

Plaintiff's condition on November 9, 2016. (R. at 930-935.) In the Questionnaire, Dr. Davy

indicated that Plaintiff suffered muscle weakness and muscle atrophy in his lower left leg, as

well as sensory loss. (R. at 931.) Dr. Davy wrote that Plaintiff "is waiting on [a] toe filler

prosthesis and custom shoes." (*Id.*) Dr. Davy also indicated that Plaintiff suffered "poor wound

healing," and that Plaintiff could not "ambulate effectively" with regard to the following

activities: walking a block at a reasonable pace on rough or uneven surfaces; using standard

public transportation, including climbing into/out of a bus; carrying out routine ambulatory

activities including shopping and banking; and climbing a few stairs at a reasonable pace with

use of only a single hand rail. (R. at 932.) Dr. Davy also indicated that Plaintiff must use a cane

or other assistive device while engaging in standing or walking. (*Id.*) Dr. Davy estimated that

Plaintiff could perform a job in a seated position for "6+" hours, but that Plaintiff could not

perform a job standing and/or walking for any period of time. (*Id.*) Dr. Davy estimated that

Plaintiff could return to a seated position in "2-3 months," and indicated that Plaintiff could not

lift or carry objects of any weight. (R. at 933.) Dr. Davy also indicated that Plaintiff would need

to take unscheduled breaks to rest at unpredictable intervals during an 8-hour workday, for the

next "6-12 months," and estimated that Plaintiff was likely to be absent from work "more than

three times a month." (R. at 934.) Dr. Davy noted that he expected Plaintiff's impairments to

last at least 12 months, and noted that Plaintiff was not a malingerer. (R. at 935.) Finally, Dr. Davy concluded that Plaintiff "may be able to return to work in a sit down position about 12-18 months from onset of condition." (*Id.*)

On December 20, 2016, Plaintiff returned to Dr. Davy. (R. at 940-941.) Dr. Davy wrote that Plaintiff "states that he is doing well and wants to return to work," and "states that he has been wearing his shoe filler and walking with no open sores on his feet." (R. at 940.) After examination, Dr. Davy concluded Plaintiff "no longer needs wound care," and Dr. Davy released Plaintiff "to work in a sit down only position next week." (*Id.*) Dr. Davy instructed Plaintiff "to be extra cautious with his left foot," and ordered a follow-up appointment for two to three months "for possible release to an annual visit." (R. at 940-941.) On March 14, 2017, Plaintiff returned to Dr. Davy. (R. at 942-943.) Dr. Davy reported that Plaintiff "states that the toe filler and diabetic shoes feel great," and "states that he has changed his restrictions for work and is awaiting the post master's decision." (R. at 942.) Dr. Davy noted that Plaintiff "may advance his activity level as tolerated." (*Id.*)

## D.     State Agency Review

In July 2016, two medical consultants for the Bureau of Disability Determination, Bradley J. Lewis, M.D., and Michael E. Harrison, completed an initial Disability Determination Explanation upon review of Plaintiff's medical records. (R. at 50-60.) The consultants found that Plaintiff had severe medically determinable impairments, and they provided a Residual Functional Capacity assessment for Plaintiff's condition as of February 20, 2017, which would have been twelve months after onset. (*Id.*) In that assessment, the consultants stated Plaintiff would have exertional limitations, but still would be able to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 4 hours; sit (with

10

normal breaks) for a total of 8 hours; push and/or pull with limited ability in his lower extremities (with no left lower extremity foot controls); and would have postural limitations. (R. at 56-57.) The consultants found that "all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given the individual's age, education, and [Residual Functional Capacity]." (R. at 59.) Accordingly, the consultants determined Plaintiff to be "Not Disabled." (*Id.*) They wrote that even though "[t]he medical evidence shows that [Plaintiff] do[es] have physical and psychological impairments that affect [his] ability to perform some types of work . . . we have determined that [Plaintiff] can adjust to other work" even if Plaintiff would be unable to perform his previous work. (R. at 59-60.)

In January 2017, two other medical consultants for the Bureau of Disability Determination, Stephen Sunderland, M.D., and Laura Sminchak, completed a Reconsideration Disability Determination Explanation upon review of Plaintiff's medical records, including a Residual Functional Capacity assessment. (R. at 62-73.) These consultants made several of the same findings as in the Initial Disability Determination Explanation, except for the Residual Functional Capacity assessment they found that Plaintiff would be able to stand and/or walk for a total of 2 hours (instead of 4 hours) and would be able to sit for a total of more than 6 hours on a sustained basis in an 8-hour workday (instead of a total of 8 hours). (R. at 68-69.) Ultimately, the consultants also determined Plaintiff to be "Not Disabled." (R. at 72.) The consultants highlighted Dr. Davy's opinion (from September 6, 2016) that Plaintiff "is unable to work for at least a year," but the consultants stated that Dr. Davy's opinion "was given little weight as it was not supported by the evidence as a whole." (*Id.*)

11

## IV. ADMINISTRATIVE DECISION

On October 22, 2018, the ALJ issued his decision. (R. at 15–24.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had engaged in substantial gainful activity since April 2017, but there had been a continuous twelve-month period during which Plaintiff did not engage in substantial gainful activity. (R. at 17-18.) The ALJ stated that "[t]he remaining findings address the period(s) [Plaintiff] did not engage in substantial gainful activity." (R. at 18.) At step two, the ALJ found that Plaintiff has the following severe impairments: type II diabetes mellitus; post left foot transmetatarsal amputation; and obesity. (*Id.*) The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and or carry 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour day; stand and/or walk for a total of two hours in an eight-hour day; no foot controls with the left lower extremity; occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds; occasionally balance; frequently stoop; occasionally kneel, crouch and crawl; occasional exposure to extreme heat, humidity, and extreme cold; and no exposure to unprotected heights or moving mechanical parts.

(R. at 18-19.) The ALJ found that Plaintiff "does have an underlying medically determinable impairment that could reasonably cause the type of pain and symptomatology alleged," but "a careful review of the record does not disclose sufficient objective medical evidence to substantiate the severity of the symptoms and degree of functional limitations alleged by [Plaintiff]." (R. at 20.) The ALJ highlighted the fact that Plaintiff "was able to successfully return to work." (*Id.*) With regard to Plaintiff's treatment, the ALJ found that Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual," again highlighting that "he has healed and returned to work." (*Id.*)

The ALJ considered the opinions provided by Plaintiff's treating podiatrist, Dr. Davy, but he only afforded Dr. Davy's opinion's "partial weight overall." (*Id.* at 20-21.) The ALJ also considered two opinions of Bureau of Disability Determination medical consultants, affording them "partial weight" and "great weight," respectively, and the ALJ also considered the representative brief dated June 20, 2018. (*Id.* at 21.)

Relying on testimony from the VE, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, he can perform jobs that exist in significant numbers in the national economy, including film touch-up inspector; laminator; and printed circuit board touchup screener. (R. at 23.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.*)

13

### V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  ANALYSIS

Plaintiff puts forth three assignments of error.  First, he asserts that the ALJ failed to properly evaluate the opinion of Plaintiff's treating podiatrist, Dr. Trevor A. Davy, D.P.M.  (ECF No. 11 at PAGEID ## 1430-1436.)  Next, Plaintiff contends that the ALJ's decision should be reversed because the ALJ improperly evaluated Plaintiff's disabling symptoms.  (*Id.* at PAGEID ## 1436-1438.)  The third assignment of error is that the VE's testimony is not supported by substantial evidence.  (*Id.* at PAGEID ## 1438-1439.)  The Undersigned finds Plaintiff's first contention of error to be well-taken.[2]

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

---

[2] While Plaintiff's remaining assignments of error are related, this finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error.  Thus, the Undersigned need not, and does not, resolve the alternative bases Plaintiff asserts supports reversal and remand.  Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, then the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v.*

*Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors

within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir.

2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical

opinion evidence within the written decision).  Finally, the Commissioner reserves the power to

decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).

Although the ALJ will consider opinions of treating physicians "on the nature and severity of

your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled

to special significance.  20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir.

2007).

 Here, the Parties do not dispute that Dr. Davy was Plaintiff's treating physician and that

his opinion is entitled to controlling weight if it is "well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with other substantial

evidence in [the Plaintiff's] case record . . . ."  20 C.F.R. § 404.1527(c)(2).  That is ***not***, however,

the standard that the ALJ applied.  Rather, the ALJ expressly stated that "**[t]reating source**

**opinions are given great weight** if well supported by medically acceptable clinical and

laboratory diagnostic techniques and not inconsistent with the other substantial evidence."  (R. at

21 (emphasis added).)  The ALJ provides no legal authority for this standard, but it appears that

the ALJ was applying rules for evaluating medical opinions for claims that were filed on or after

March 27, 2017.  *See* 82 Fed. Reg. 5844 (indicating that, beginning with claims filed on or after

March 27, 2017, the Social Security Administration will not give controlling or specific weight

to any medical opinion or "prior administrative medical finding," including those from the

claimant's "medical sources"); *compare* 20 C.F.R. § 404.1527(c)(2) (indicating for claims filed

before March 27, 2017, "[i]f we find that a treating source's medical opinion on the issue(s) of

the nature and severity of your impairment(s) is well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

in your case record, we will give it controlling weight.") *with* 20 C.F.R. § 416.920c(a) (For

claims filed on or after March 27, 2017, "[w]e will not defer or give any specific evidentiary

weight, including controlling weight, to any medical opinion(s) or prior administrative medical

finding(s), including those from your medical sources.").  Plaintiff filed his application on March

8, 2016, however.  Consequently, as the Commissioner affirmatively concedes (in a footnote),

"the new rules do not apply to this case."  (ECF No. 11 at PAGEID # 1450 n1.)

  The difference between "controlling weight" and "great weight" is significant, and

mandates a brief discussion.  When an opinion is given "controlling weight," it must be adopted,

as it "controls over other medical source opinions of record, especially those provided by non-

treating and non-examining medical sources."  *Young v. Colvin*, No. 3:12-CV-00029, 2013 WL

3350828, at *8 (S.D. Ohio July 3, 2013), *report and recommendation adopted*, No. 3:12-CV-

029, 2013 WL 4457308 (S.D. Ohio Aug. 19, 2013); *see also* SSR 96-2P (S.S.A.), 1996 WL

374188, at * 1 (July 2, 1996) ("If a treating source's medical opinion is well-supported and not

inconsistent with the other substantial evidence in the case record, **it must be given controlling

weight; i.e., it must be adopted**.") (emphasis added).  By contrast, when an opinion is given

"great weight," it does not necessarily have to be adopted, as "such weight could be overborne

by a non-examining or record-reviewing medical source opinion without any consideration of the

deference generally due a treating medical source's opinions."  *Young*, 2013 WL 3350828, at *

8.

Here, however, the distinction may be purely academic, as the ALJ found that Dr. Davy's

opinion was not entitled to either "controlling weight" or "great weight."  Instead, after

reviewing Dr. Davy's medical notes, the ALJ found that Dr. Davy's opinion deserved only

"partial weight," for the following reasons:

> Treating source opinions are given great weight if well supported by medically
> acceptable clinical and laboratory diagnostic techniques and not inconsistent with
> the other substantial evidence; however, no special significance is given to the
> source of an opinion on whether the claimant is "disabled" or "unable to work."
> These are issues reserved to the Commissioner. The undersigned takes note that
> when the opinions were rendered, the claimant was not ready to return to work, as
> he was still healing; yet, after November 2016, the claimant was clearly able to
> return to at least sedentary work, as shown by the claimant having no open wounds
> and being able to be fitted for his toe filler shoe inserts (see Exhibit 10F/3). The
> claimant was interested in returning to work in December 2016, reporting that he
> was doing well, had been wearing the toe filler and walking with no open sores on
> his feet (see Exhibit 10F/5). Moreover, at that time, Dr. Davy even released the
> claimant to a "sit down" position. In March 2017, the claimant returned for a
> follow-up visit and at that time reported that doing well, had no open lesions on his
> feet and that the toe filler and diabetic shoes felt great (Exhibit l0F/7). At that time,
> he reported having changed his restrictions for work and was awaiting the
> postmaster's decision. Therefore, the undersigned gives the statements, insofar as
> they can be considered opinions, partial weight overall.

(R. at 21.)  Given this finding, the ALJ was required to provide "good reasons" for discounting

Dr. Davy's opinion.  20 C.F.R. § 416.927(c)(2).  The Undersigned finds that the ALJ did not do

so here.

In this case, the ALJ never expressly concluded that Dr. Davy's opinions were not "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and [were] not

inconsistent with other substantial evidence in [Plaintiff's] case record" before deciding to give

Dr. Davy's opinions only partial weight.  (R. at 15-24.)  This is the standard for declining to afford

Dr. Davy's opinion controlling weight as Plaintiff's treating physician.  *See* 20 C.F.R. §

404.1527(c)(2) (For claims filed before March 27, 2017, "[i]f we find that a treating source's

medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). Rather, the ALJ summarily discounted Dr. Davy's opinions, providing the following three reasons in support: (1) "after November 2016, the claimant was clearly able to return to at least sedentary work, as shown by the claimant having no open wounds and being able to be fitted for his toe filler shoe inserts"; (2) "[t]he claimant was interested in returning to work in December 2016, reporting that he was doing well, had been wearing the toe filler and walking with no open sores on his feet" and "at that time, Dr. Davy even released the claimant to a 'sit down' position"; and (3) "[i]n March 2017, the claimant returned for a follow-up visit and at that time reported that doing well [sic], had no open lesions on his feet and that the toe filler and diabetic shoes felt great" and "he reported having changed his restrictions for work and was awaiting the postmaster's decision." (R. at 21.) The Court will address each of these reasons in turn.

First, the ALJ references an open letter by Dr. Davy, dated November 9, 2016, in which Dr. Davy noted that Plaintiff's "incision is currently healed and he is awaiting custom prosthesis and shoes." (R. at 929.) The ALJ states, with no support, that this statement shows that Plaintiff "was *clearly able* to return to at least sedentary work." (R. at 21 (emphasis added).) The ALJ did not, however, consider Dr. Davy's other comments from that letter, including that: (1) Plaintiff's prognosis was "guarded"; or (2) Plaintiff "*may* be able to return to work in a sit down position once he has the prosthesis, shoes, and regained his muscle strength." (R. at 929 (emphasis added).) Nor did the ALJ cite other portions of Dr. Davy's treatment notes from Plaintiff's November 9, 2016 appointment, in which Dr. Davy noted that: (1) it would be "2-3 months" until Plaintiff could return to a seated position; and (2) Plaintiff would need to take unscheduled breaks to rest at unpredictable intervals during an 8-hour workday. (R. at 930-935.)

Next, the ALJ references the Progress Notes from Plaintiff's December 20, 2016 appointment with Dr. Davy, in which Dr. Davy noted that Plaintiff "states that he is doing well and wants to return to work" and "he has been wearing his shoe filler and walking with no open sores on his feet." (R. at 940.) In those Progress Notes, Dr. Davy released Plaintiff "to work in a sit down only position next week." (*Id.*) Absent from the ALJ's analysis of Plaintiff's condition at that time, however, is any reference to Plaintiff's testimony that "when [Plaintiff] was explaining to [Dr. Davy] that [Plaintiff] was wanting to go back to work, it was just [Plaintiff's] frustration with not working," because Plaintiff "just wanted to get back." (R. at 37.) Plaintiff further testified that, as of December 20, 2016, his foot still had to heal before he could return to work. (R. at 37-38.)

Finally, the ALJ references the Progress Notes from Plaintiff's March 14, 2017 appointment with Dr. Davy, in which Dr. Davy noted that Plaintiff "states that he is doing well," "states that he has no open lesions on his feet," "states that the toe filler and diabetic shoes feel great," and "states that he has changed his restrictions for work and is awaiting the post master's decision." (R. at 942.) In those Progress Notes, Dr. Davy wrote that Plaintiff "may advance his activity level as tolerated." (*Id.*) Again absent from the ALJ's analysis is reference to Dr. Davy's note that Dr. Davy instructed Plaintiff "to check his feet multiple times daily," and that Dr. Davy still assessed Plaintiff to suffer from gas gangrene and Type 2 diabetes mellitus with diabetic peripheral angiopathy with gangrene. (*Id.*)

The ALJ did not provide an analysis of Dr. Davy's findings beyond the conclusory dismissal outlined above. Instead, as reflected in these three "reasons," the ALJ uses Plaintiff's subjective statements of improvement over time against Plaintiff, implicitly suggesting Plaintiff's gradual improvement is incompatible with a disability finding. The ALJ repeatedly

states in his Decision that Plaintiff "was able to successfully return to work," that Plaintiff "has not generally received the type of medical treatment one would expect for a ***totally*** disabled individual," and that Plaintiff "has healed and returned to work."  (R. at 20 (emphasis added).)

The ALJ appears to have overlooked, however, the fact that Plaintiff has "requested a ***closed period*** of disability, from February 21, 2016 to April 1, 2017."  (R. at 15 (emphasis added).)  It is an inevitable reality that claiming a closed period of disability means that a claimant has improved over time, to the point where she or he no longer claims to be disabled. *See Long v. Sec'y of Health & Human Servs.*, 45 F.3d 430, at *2 (6th Cir. 1994) ("In order to find a closed period of disability, the Secretary must find that at some point in the past, the claimant was disabled and that, at some later point in the past, he improved to the point of no longer being disabled."); *Ross obo K.R. v. Comm'r of Soc. Sec.*, No. 1:16-CV-739, 2017 WL 3085351, at *4 (S.D. Ohio July 20, 2017), *report and recommendation adopted sub nom. Ross v. Comm'r of Soc. Sec.*, No. 1:16-CV-739, 2017 WL 4012084 (S.D. Ohio Sept. 12, 2017) ("If an ALJ has found a claimant disabled for a closed period, the ALJ must find a medical improvement in the claimant's condition to end his benefits.") (citing *Niemasz v. Barnhart,* 155 Fed.Appx. 836, 839-40 (6th Cir. 2005)).)  Such improvement does not happen overnight, however, and a claimant's gradual improvement to the point of no longer being disabled does not invalidate the period of time during which they were disabled.  If it did, there could be no such thing as a closed period of disability.

Here, as Dr. Davy noted during Plaintiff's November 9, 2016 visit, Plaintiff is not a malingerer.  (R. at 935.)  Plaintiff's subjective statements, both to Dr. Davy and to the ALJ during the administrative hearing, confirm that Plaintiff wanted to get back to work as quickly as possible.  Further, the records consistently support that Plaintiff followed all medical directions

and instructions, including weight bearing restrictions, a hyperbaric treatment referral, and home health treatments. Despite Plaintiff's model performance during the recovery process, Dr. Davy still noted that Plaintiff's treatment was slow, in a deliberate effort to avoid further complications, which could result in a below-knee amputation. (*See* R. at 893 (September 9, 2016 letter) ("He is currently incapable of performing work of any type due to his risk of complication and limb loss."), 903 (September 26, 2016 treatment notes) ("[Plaintiff] has made slow progress. We are trying to avoid a below knee amputation."), 929 (November 9, 2016 letter) ("[Plaintiff] was at severe risk for limb loss.").) Given Dr. Davy's intimate knowledge of Plaintiff's condition, including Dr. Davy's firsthand experience with Plaintiff's multiple complications while he was hospitalized, Plaintiff's slow recovery plan (and Dr. Davy's guarded outlook of Plaintiff's condition throughout recovery) is eminently reasonable and is well supported by the record. In light of all of this, Plaintiff's ambition to overcome his physical condition and return to work should be applauded, not punished. At the very least, Plaintiff's reports of gradual improvement and his indisputable subjective desire to get back to work as quickly as possible are not prohibitively inconsistent with a finding of disability, especially in the context of a closed-period claim.

Taken together, the ALJ's conclusory explanations for discounting Dr. Davy's opinions do not meet the standard of providing "good reasons" for discounting a treating physician opinion under 20 C.F.R. § 416.927(c)(2):

> Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. [*Blakley*, 581 F.3d at 408.] Put simply, it is not enough to dismiss a treating physician's opinion as "incompatible" with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.

23

*Friend*, 375 F. App'x at 552. In *Friend*, the plaintiff's treating physician completed a physical functional capacity assessment form indicating that the plaintiff could only stand or walk one hour per eight-hour day. *Id.* at 545. The ALJ rejected his opinion in favor of the opinion of a reviewing physician, reasoning that "'the testimony of [the treating physician] which would allow the claimant to stand/walk for one hour [at a] time to a total of six hours in an eight hour workday, is more consistent with the objective clinical findings,' and 'there is no basis for [the treating physician's] conclusion that the claimant can stand/walk for only one hour in a day.'" *Id.* at 551. The Sixth Circuit held that the ALJ's explanation was insufficient to satisfy the reasons-giving requirement. *Id.* In particular, the Court reasoned that the ALJ failed to identify, let alone discuss, the particular "objective clinical findings" he found inconsistent with the treating-source opinion. *Id.* The Court found that, even if it is inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. § § 404.1527 and 416.927. *Id.* at 551-552.

Here, the ALJ's opinion is conclusory and does not identify which of Dr. Davy's objective clinical findings the ALJ found to be inconsistent with Dr. Davy's opinions. At most, the ALJ appears to be trying to contrast Plaintiff's subjective statements of improvement over time with Dr. Davy's objective, clinical observations of disability, but the two are not inherently inconsistent or mutually exclusive. As Plaintiff explained during the June 2018 hearing, it is possible for Plaintiff to have been subjectively frustrated and want to return to work as quickly as possible, while at the same time Dr. Davy was objectively observing that Plaintiff was not medically ready to do so. The ALJ did not entertain this possibility, however, and instead discounted Dr. Davy's opinions under the guise of an irreconcilable inconsistency. Notably, the ALJ did not explicitly apply any of the factors provided in 20 C.F.R. § § 404.1527 and 416.927

in his decision to assign "partial weight" to Dr. Davy's opinions, so his reasoning is not "sufficiently specific to make clear to any subsequent reviewers . . . the reasons for that weight." *Friend*, 375 F. App'x at 550.

In *Wilson*, the Sixth Circuit considered three possible scenarios that could lead the Court to a finding of harmless error even when the ALJ failed to articulate good reasons for not assigning controlling weight to a treating physician's opinion. 378 F.3d at 547. First, the Court indicated that harmless error might occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it . . . ." *Id*. Second, the Court noted that if the ALJ's decision was "consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." *Id*. Finally, *Wilson* considered the possibility of a scenario "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Id*. While the first two routes to a finding of harmless error plainly are not applicable here, the third possible route to a finding of harmless error, that the goal of § 1527(d)(2) has been met despite noncompliance with its terms, requires more analysis here.

In *Hall v. Commissioner of Social Security*, the Sixth Circuit elaborated on how an ALJ might meet the goal of § 1527(d)(2) without complying with the procedural requirements, explaining as follows:

> As applied to this case, the ALJ could have met the goal of providing good reasons by either his analysis of Dr. Caudill's other opinions or his analysis of Hall's back problems in general. Such analyses would perhaps adequately address Dr. Caudill's opinion about Hall's back pain by indirectly attacking the "supportability" of the doctor's opinion, § 404.1527(d)(3), or the "consistency" of his opinion with the record as a whole, § 404.1527(d)(4), both of which are grounds for rejecting a treating source opinion, see § 404.1527(d)(2). However, it is critical that, when reviewing the ALJ's reasoning for this purpose, we remember the goals

of the procedural safeguard. We are reviewing the 1998 decision to see if it implicitly provides sufficient reasons for the rejection of Dr. Caudill's opinion regarding Hall's back, *see Wilson*, 378 F.3d at 544–45 (discussing purposes of treating-source regulations), not merely whether it indicates that the ALJ did reject Dr. Caudill's opinion.

*Hall v. Comm'r of Soc. Sec*., 148 F. App'x 456, 464 (6th Cir. 2005) (footnotes omitted).

Thus, "the equivalent of good reasons for not adopting a treating source's opinion could perhaps be found in an ALJ's analysis of the ailment addressed by the opinion" or in the ALJ's analysis of the treating physician's other opinions. *Id.* at 465. Indeed, "[a]n ALJ may accomplish the goals of th[e] procedural requirement by *indirectly* attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010) (emphasis in original) (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470–72 (6th Cir. 2006); *Hall*, 148 F. App'x at 464–65). In determining whether the ALJ indirectly attacked the treating physician's opinion, "courts look to the ALJ's decision itself, and not other evidence in the record." *Coldiron*, 391 F. App'x at 440.

Here, neither the ALJ's analysis of Dr. Davy's opinions nor his analysis of Plaintiff's impairments adequately attack Dr. Davy's opinions regarding Plaintiff's condition. The Undersigned also finds that the Court cannot engage in a meaningful review of the ALJ's rejection of Dr. Davy's opinion because he did not explicitly discuss how each of the six factors in 20 C.F.R. § 404.1527(d)(2)-(6) either supported or undercut rejection of the opinion. *See Nelson*, 195 F. App'x at 472 (noting that it is "rare" for the ALJ's analysis to meet "the goal of the rule even if not meeting its letter").

Because the Undersigned cannot otherwise trace the ALJ's path of reasoning, and because the ALJ has not provided good reasons for the "partial weight" given to the opinions of Plaintiff's

treating physician, remand is required.  *See Rogers*, 486 F.3d at 243 (explaining that one of the purposes of the good reason requirement is to ensure meaningful appellate review of the ALJ's application of the treating physician rule); *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (finding that "the ALJ's decision still must say enough 'to allow the appellate court to trace the path of his reasoning.'") (quoting *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)); *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545) ("[W]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Finally, the Undersigned declines the Commissioner's invitation to weigh the evidence to conclude that substantial evidence does not support Dr. Davy's opinion.  As the Sixth Circuit has recognized in similar circumstances:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion, thus, a different outcome on remand is unlikely.  A procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway. * * * To hold otherwise, and to recognize substantial evidence as a defense to noncompliance with [20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)], would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Wilson*, 378 F.3d at 546.

For these reasons, it is **RECOMMENDED** that Plaintiff's first contention of error be **SUSTAINED**.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence does not support the ALJ's decision denying benefits. Based on the foregoing, it is therefore **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** under Sentence Four of § 405(g).

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: December 16, 2020                    /s/ *Elizabeth A. Preston Deavers*
                                           **ELIZABETH A. PRESTON DEAVERS**
                                           **CHIEF UNITED STATES MAGISTRATE JUDGE**